So we'll call Rotec Industries v. Mitsubishi Corp. and I see an empty counsel table. Who has not arrived? So there is no appearance for the appellant and it is about three minutes after nine. The case was called for nine. Counsel for the appellees, do you wish to be heard in view of the absence of the in my 35 years of practice in law, I've never had a situation like this occur where opposing counsel hasn't been heard. It doesn't happen very often, does it? No. And I mean, I'd be glad to talk about what I think are the salient points that require the affirmation of the decision. And I'd be glad to answer any questions you have. And I'll leave it up to you to let me know what you want me to do. No, no, it's your call. It's not our call. It's your call. Well, let me just say what I think the case is about and why I think you have to confirm it. They may come in when you're talking. Well then I'll sit down. If you tell me to sit down, I'll sit down. If you want me to continue, I'll continue. This is a case involving a Chinese contract to be performed in China, involving a Japanese company, Mitsubishi, a large Chinese corporation called Three Gorges. And all of the activities occurred basically in China. This is a matter that's been involved since 1997. We've had three lawsuits. We've had 18 counts that have been either abandoned, dismissed or totally rejected out of hand by summary judgment. Are you the one that has the motion pending on judicial notice of the proceedings in the other two cases? Yes, Your Honor. We'll rule on that as we rule on the merits thing too. But I know that at least I detected that was still pending. It is still pending. I don't think you've given us a viewpoint on that one yet. But in our situation, we have a contract that was entered into between Mitsubishi and Three Gorges to supply certain equipment, large equipment. This equipment is crane equipment that's roughly two and a half times the length of a 747, just to give you an idea of the magnitude of the equipment. Very, very large equipment, very expensive equipment. And this equipment was the subject of this whole dispute. The Three Gorges wanted to have five units to help supply the concrete for the placement of concrete at the dam. Three of the units were given to ROTEC, two of the units were given to Mitsubishi. What this case is about is ROTEC is saying, you shouldn't have got those two units. You did something wrong and we want you to pay for it, basically. And we've been arguing about this thing since. What was the purpose of the 0.5 percent that was supposed to be paid? What was that for? That was for this. When Mitsubishi went to Three Gorges, it had no prior experience with this kind of equipment. And it elicited the help of Poton, which is a big French company, and originally C.S. Johnson, which later got replaced by Nippon Conveyor. Because the equipment was untested, there was a requirement to do a little more work on behalf of Three Gorges to test it. And also the requirement was that there be more letters of credit. And what Mizutani testified, the executive for Mitsubishi, was that because of this continued activity and all these letters of credit, Three Gorges said, well, can you give us some money for the payment for the services we're providing to help you get these letters of credit and to test the equipment? And at the tail end, around December of 1996, is when the Three Gorges, Wu Jun, decided that I'd like to have a 0.5 percent return. After we pay all your money, then I want to have that back. Now, as of the record, the record shows that that hasn't been paid yet, as of the time. That wasn't supposed to be paid until the job was done, was it? Well, until the job was done and the payment for the equipment was actually made. It was so many days after the payment was made that we would have obligation to pay that money to a sister bank in Hong Kong. And Three Gorges anointed something called Chinese Resources National Corporation, CRNC, to be its negotiator. And that company said, we want the money transferred to our sister company, CRMC Machinery, in Hong Kong. And that's what the contract says. That's what the addendum says. And that's what it was for. Are you serious about your raised-judicata argument? Well, we think—I went into a lot of trouble to brief you, Your Honor. Well, I know you did, but the thing that bothers me is it never was decided by the district courts. You raised it for the first time here. Ordinarily, we don't really like that. And I know that, yeah. But I was hoping that you'd see that we didn't have an opportunity to even raise it until the decision was made in the Illinois court, where the summary judgment was granted, saying there was no trade secret misappropriated. But once you have waived the opportunity to complain about splitting a claim while it's pending, why would it be appropriate then to allow you to let the two parallel cases go forward, pick the first one, and then say, aha, raised-judicata, you should have raised those claims over here when you didn't complain about the splitting of the claim? They had the opportunity to make the case in Illinois. The scheduling order in Illinois said February 15, 2000 was when the scheduling order said, that's the date that you have to do whatever you have to do in terms of amending the claims. At that time, there was a series of discovery going on. What the court in Illinois said was, wait a second, Rhotak. You had the opportunity to amend the scheduling order to bring in this new amended complaint. You didn't do it. You just filed a motion to amend the complaint. And you told Mitsubishi all along, for several months, you were going to do it, you were going to do it, you were going to do it, and you didn't do it. And so the judge, Judge Bernthal, the magistrate judge in Illinois said, in effect, you procrastinated. You could have done it earlier. You didn't do it earlier. I'm not going to let it in. If you want to file somewhere else, you can file it somewhere else. But I'm not judging the propriety of doing that. That's for somebody else to make a decision on. So what happened was, they filed in October of 2000 a case here in Portland. Right, and you didn't make a claim then. This is kind of a can, I guess, to Joe Scopel's point. You didn't make a claim at that time. We thought it was premature to make it at that time, because we had no decision, one way or the other, from the judge. And we didn't know what he was going to do, Judge McCuskey in Illinois. We didn't know what he was going to do in connection with the tortious interference count. We asked him to dismiss it with prejudice. In effect, that's what he did. But we had no way of knowing that. So the claim splitting was something that we couldn't deal with at that time, in our view. That's our position. I didn't know about that. That's why I just wanted to give you an opportunity to help me. Well, as we pierce through this case, there's really two issues here. One is whether Section 2C, subject matter jurisdiction section part of it, is met by the facts in this case. And the second issue, piercing through all of the rhetoric, is whether there was causation proven when they had an opportunity to do so and didn't do it. Now, our position on the Section 2C Robinson-Patman claim is that the engaged in commerce, and in the course of such commerce, is a very limited jurisdictional issue. And those particular words mean something, not what Rotex says. It doesn't mean affect commerce. It isn't like affecting commerce or involving commerce, like a Section 1 Sherman Act violation. And we take the position that Gulf Oil versus Copp clearly indicates that the Rankin decision, this court's decision in 1965, the teeth were taken away from it as a result of Circuit City, and also the Copp case. But what do you think Congress intended by having the language different under 2A and 2C? Why? There's no difference with respect to the engaged in commerce. No. And the furthest of commerce. I mean, in the course of commerce. That's in both 2A and 2C. But the competitive situation is not in 2C. It's not. But we're only talking about the words that result in subject matter jurisdiction. They're the same in both 2A and 2C. And all the cases that try to interpret that language bounce back between 2A and 2C because the same language is in both. And our position is, if the same language is in both, then that type of subject matter should be determined the same way. Whatever the definition is of engaged in commerce and in the course of such commerce should be the same for Section 2A and 2C, even though 2C is broader in the sense that it doesn't have that third requirement. You know of any cases where they have said that the test is the same under 2C and 2A jurisdictional test? Yes, I think we've cited those cases. I think we've cited those cases. And also, in terms of the effects issue, I don't know if you want to go to that now, but in terms of the effects issue, we did find one case, Western District of Michigan case, where the very issue of whether 2C could be read broad enough to inquire an effects test. And that court said no. And that's the only case that we know of that even deals with that issue. And that is not something that's been dealt with by opposing counsel. In their briefs, either down below or up here. Well, I know we, the Ninth Circuit, don't have any precedent on that, but I think Judge Rothstein and C.L. came down indicating that they should be considered independent of one another. Are you aware of that case? No. When that was decided, I think, well, I don't remember the exact date now. Well, I think, as I read the cases, and as we argued it in our briefs, a lot of times when the courts are trying to construe what the 2C jurisdiction means in terms of engaging commerce and in the course of commerce, they've looked at 2A cases. And the reason they've looked at 2A cases is because of the same languages in both. And there are cases that tell us that when you have the same language in both, they should be construed the same way, even if there's a third requirement. And even if the basis for the jurisdiction is a little different because of the added requirement. I don't know how you want to handle this. Counsel, are you Mr. McAndrews and Mr. Willis? We are here, Your Honor. OK, well, all three of you. We apologize. We were under the impression we started at 930. But I noticed the clerk is called our clerk this morning. Is that true? Well, we just don't know. That's done by the clerk's office in San Francisco. But the start time was 9 o'clock. So no problem. You'll be able to argue in rebuttal. Mr. Warnke is not completely finished with his comments. And you may use your time after he's done. I think I've indicated what our position is in connection with the Rankin case and the Cobb case. I'd like for now to turn, if I might, to the causation issue on tortious interference. The judge down below says the Rankin case is still good law here. No, I do not. Not with respect to the interpretation of what engaged in commerce and in the course of commerce means. I think it is not good law. It should be overruled with respect to that aspect. The only tie on interstate commerce here is the tools. Yes. The situation with respect to its appendix 7 to the contract initially said, and did say, FOB US. I realize that the tools were not delivered by the American company, but delivered by Japanese. But is that the tie that we have as far as interstate commerce is concerned? That's what Rotek argues. And they also argue that somehow, and we're not exactly sure how, this contract had some effect on United States commerce. And we take the position, this is not the law. That's the Rankin test. The Rankin test is no longer the law. Gulf Oil, Circuit City clearly indicate that. So the effects test is not enough. It's got to be something that's engaged in commerce and in the course of commerce. That's the test. That's what has to be done. And we take the position that appendix 7, the tools, does not meet that test. That's where Judge Rothstein disagrees with you. OK. With respect to the causation issue on the tortious interference, Judge King determined that with respect to the causation factor, that there was absolutely no evidence that indicated any of the acts, any of the so-called activity, had any influence on the Three Gorges decision making. Now, let me explain a little bit what the facts are. They're undisputed. There was a bid evaluation. Parties had to submit bids to this evaluation committee. And then the evaluation committee made certain recommendations for Three Gorges, the top layer. And then they made a decision, yea or nay. What we know is that Wheat made a bid, Rotec made a bid. Nobody knows, and there's no evidence, as to what the bid evaluation committee considered, what was said by anybody in the bid evaluation committee. And keep in mind, there's 60 people on this committee. Nobody knows what they said, how they reacted to any particular fact, what influenced their decision making, and what the Three Gorges actually did when they received the bid. Did they agree with it? Did they disagree with it? Did they modify it? None of that information is available. So there's absolutely no information that legal activity, whether it be the 0.5% addendum, or the award of the quality control job, had any effect on the decision making responsibility. On that basis, we submit that the judge properly made the decision that you've not satisfied your burden of proof on the causation element, even assuming, arguendo, that there's something wrong with the 0.5%. And he said there was an issue of fact there, and also the Judge King, in his decision, said that it's illegal, but there's no causation. Isn't that what he said? He didn't say it was illegal. What he said was, he says, assuming there's an issue of fact as to whether it's illegal or not. I'm assuming that for the sake of the argument. You haven't proven causation, so I don't need to really get that. He didn't really decide the issue. He just is assuming there's an issue of fact. What difference would that make, though, if there's an absence of causation? Does it matter whether there's an assumption of an actual violation, or merely an assumption that there's an issue of fact? How does that make any difference? From the decision making standpoint, none. But what he was really saying is, I don't need to get involved in making an ultimate determination on it. I'm going to assume that there's an issue of fact as to whether it's legal or not legal. But you can't make out your causation. You can't show that as a result of the 0.5% addendum, or as a result of the award of the QC job to Xingming Zhang, that that had any influence and caused anything to happen in terms of this bidding. And he said, absent that, you lose, because you haven't made out one of your elements of proof. Well, they want us to rely on some inferences. Yes, principally the commission, and also the evaluation situation, and also the difference in the $2 million difference in the contract. You think that's just sheer speculation? How do we overcome that? Well, I think they're asking you to draw an inference that because of the fact that some activity might be illegal, that it caused somebody to do something. As the judge said down below, that's too great a leap to make. That's too great a leap. You've got to be able to show, for example, let me give you an example. Let's assume Wu Jun, who signed the addendum, was the only member of the evaluation committee, and he made the decision. And let's assume also that he received the money personally, not the sister company in Hong Kong. Then you might be able to draw an inference. But here, you've got 60 members. You have no indication that the money has even been paid yet, but it was to be paid to a sister corporation. It was put right on the agreement. There was no hiding of it. It was right there. It was right there. You can't draw any conclusions from that fact alone that there was some type of causation. Just like you can't draw the conclusion that because Rotec got three units and we got two, and if we didn't get the two, they would have gotten the three, or the other two. There could be all sorts of things that could happen. It's all speculation. At some point in time, you've got to be able to say, I can't make the jump. And we say there's too many bounces to be able to finally get to the end result. In order for their inferences to make sense, they've got to assume that somebody, one of the three guys, told somebody on the bid evaluation committee, give Mitsubishi favorable treatment. Then you've got to assume that was accepted by someone else on the 60. Then you've got to make another assumption that they had some kind of an influence on the decision-making process. There's too many jumps in that house of cards inference structure. That's what Judge King felt. You should have taken discovery. Listen, the other thing that you have to keep in mind is this. They told us that they were going to take six to 10 people in China, take their discovery. We said, OK, and they got your Rule 56F application. They never did it. They said that on several occasions that they were going to take discovery. They sat on their rights. They could have done that. Now they're trying to say, well, wait a second. We didn't take discovery, but we're entitled to rely on inferences. They had their opportunity, and they chose not to take advantage of it. So they can't now say, wait a second. We don't have that. Actually, that doesn't matter if there are sufficient facts already in the record. That's the only thing we have to look at, is that. Whether they could have done more really doesn't bear on the meaning of what's in the record, does it? If the specific facts that they have established would support a causation. So that's really our question. That's really what you. That's the nail on the head, so to speak. And I take the position, the Submission takes the position, that the facts that they've alleged are insufficient for anybody to make a reasonable inference that they were caused injury and suffered damage. The Evaluation Committee, they wanted to take the deposition of some of these Evaluation Committee members, and they didn't. What would be the best evidence of what they did? What they said they did. Not speculation or innuendo as to what they could have done or might have done. Well, in their opinion, they thought they had enough. Yeah, I know that. They figured the facts, and that they were the only qualified bidder. So if you didn't get it, they would get it. I think that basically is, as I understand, what their position is. Yes, and we're saying that that's not enough. That's simply not enough. Now, wasn't there some assertion by the buyer as to why they chose Mitsubishi? I thought there was something in the record that said the 5% and the job situation had nothing to do with our accepting Mitsubishi. The reason we did was because there were some problems with the Ramco product. Mike, you were incorrect in that? Yes, there were some problems with the Rotec product, and they were concerned about giving an exclusive. And that's what the Haig-Kong letter talks about. And he said, and he was writing it to the U.S. consul located in Beijing in response to a letter they had sent about this very contract issue. And Haig-Kong said, basically, we did not want to have an exclusive. There were some problems with the Rotec equipment. And we don't, and the facts clearly show that Three Gorges did not have exclusives with anybody. They basically wanted to have multiple sources, secondary sources, which is obviously not an unusual request. Counsel, your time has expired. Okay, thank you. Thank you. May I have, I mean, I haven't had a chance to respond to them. That's life, I'm afraid, today. This whole thing has become, turned the other way. But they, on the other hand, didn't hear half of your argument to respond to it. So we have all carefully read the materials. So I think we'll give them their time at this point. Thank you. Good morning, Your Honors, and may it please the Court. I'm Matt McAndrews, representing Rotec. With me are my father, George McAndrews, and my colleague, Jerry Willis. Unfortunately, we did not hear what, if any, arguments Mr. Warneke made with respect to the rest judicata issue that defendants raised 21 months after the filing of Rotec's complaint. We asked them some hard questions about that, so for whatever that's worth in your. Thank you, Your Honor, I appreciate that. As appellant, would it be all right if Rotec reserved five minutes in serve rebuttal? No, we're not going to do that. They've used up their entire 20 minutes. Does the Court wish to hear argument on the rest judicata issue, or shall we address the Robinson-Pattman 2C and causation issues? Well, each member of the panel may have different views, but I'd prefer to hear on the merits of the Robinson-Pattman Act if my colleagues would agree. I will briefly address the Robinson-Pattman 2C issue, Your Honors. Rotec believes that it is very, very straightforward, and then I will leave the balance of our argument to Mr. Willis. He'll discuss the intentional interference Oregon State law claim. With respect to Rotec's Robinson-Pattman claim, the District Court erred by disavowing the proper jurisdictional analysis for that claim. I heard Mr. Warnecke speaking about it. I did not hear his entire argument. That proper analysis in the Ninth Circuit was set out clearly in the Rangan case. Why is that still good law? Your Honor, it's still good law because the essence of the holding on which Rotec now seizes from Rangan was echoed in May Department Store. It has been echoed in other cases. That wasn't really the issue in May Department Store. Your Honor, it was not the central issue. It was a matter of whether or not they were entitled to amend their complaint to go ahead and state a cause of action. Wasn't that the main issue in that case? The main issue in that case was, at the same time, the central issue, the very citation to Rangan in the May Department case was on the central issue that's now. I was on the panel in that case. The reason I have some memory of it. Okay. I did disagree with the other two on whether it was a service or whether it was a good. Okay. Rotec also notes that in the other district court cases mentioned in our brief, notably Thurman, the Thurman case out of the Western District of Washington, the Gulf Oil case that surprisingly defendants have cited and supported their proposition that Rangan is no longer good law. Gulf Oil was addressed. It was mentioned in May Department Store. It was also addressed in the Thurman case. And in neither of those cases was the validity of the Rangan 2C analysis called into question. I believe that to be a very relevant point here. More importantly, the central case on which defendants relied in attacking the validity of Rangan, Gulf Oil, was not a 2C case at all. It was a 2A case. It talked about the meaning of commerce, which is a term that appears in both 2A and 2C. So do you think that the court necessarily was deciding the meaning of commerce in both subsections? Your Honor, what I do know, I just read the Gulf Oil case earlier this morning, is that the Gulf Oil court made a point of distinguishing the section 2A, or the distinction between section 2A language and section 2C language. And that distinction is that there is an additional limitation. We believe that additional limitation that appears in section 2A in the cases on which defendants rely, and the lack of that limitation in 2C is critical to the analysis in this case. Why do you think Congress didn't use the same language in both 2A and 2C? In one situation, you have price discrimination. In the other situation, you have a bribery situation. Why should the jurisdictional requirement be any different in one than in the other? Your Honor, I would respond by saying that I think that the Ninth Circuit was better qualified to address that issue than I am. And I think the Ninth Circuit did that in Rangan. In May, the department store, although not the central issue, the court certainly did not disavow Rangan. In fact, it cited the central proposition of Rangan. And there had to be a reason. I mean, that's common statutory construction principles. I remember back from my law school days. The addition of the clause, quote, either or any of the purchases involved in such discrimination, be it interstate commerce, is a critical limitation appearing in section 2A and absent from section 2C. One of the things that I would point out to the court as well is that even if the section 2A standard were to apply in this case, and it does not. ROTEC's claim is under section 2C of the Robinson Patent Act. ROTEC argues that we would meet the 2A standard. As Your Honors were discussing with Mr. Warnicke, one of the critical parts in the appendices to the contract between the Chinese buyer and the defendants specifically called for the provision of 58 categories of American goods. That cannot be read out of the contract. It certainly should not be read out of the analysis. Well, $50,000 on a $15 million deal doesn't seem to be very substantial, does it? Your Honor, it does not seem to be substantial. However, following the rationale in Rangan, there can be jurisdiction under 2C with $0 transferring across interstate lines. In short- What was transferred? The tools were never actually supplied by the U.S. company. It was supplied by Japan, wasn't it? The tools ultimately were supplied by Japan, Your Honor, but I think we cited a wealth of cases in our main brief that stand clearly for the proposition that a contract for the sale of interstate goods is interstate commerce in its essence. If the Court doesn't have further questions on the applicability of the Rangan case, I'll turn over the remainder of our time to Mr. Willis to discuss the causation issue. Thank you. Thank you, Your Honor. Thank you. Morning, Your Honor. Again, I apologize for tardiness. That was my responsibility. With respect to Lotech's tortious interference claim, as Mr. Warnke pointed out, for context, there was a bid evaluation process and then a negotiation process. One of the things that Mr. Warnke didn't say was that unless a bidder was recommended by the bid evaluation committee to the buyer, that bidder was not in a position to negotiate for the sale of the contract with the buyer. And as he said, the district court held that Lotech had not presented any evidence of how the defendant's wrongful conduct influenced the evaluation process or how the wrongful conduct influenced the buyer's decision. Obviously, we disagreed. We relied on the Calguard case to support our causation argument. Calguard was a Oregon appellate court case where the court held that, quote, what motivates a person to act is seldom susceptible of direct proof, and proof of what motivates a person to act is almost always circumstantial and inferential. And although the district court did address the Calguard case, the district court did not address or discuss these propositions of Oregon law. I don't think the court was really, at least as I read it, denying that circumstantial and inferential evidence could support a finding of causation. I read it as being more fact-specific than that, of saying even though that is theoretically possible, it just hasn't happened here. And I wonder if you would go through your view of what the best evidence is of actual causation, that it was the wrongful acts of Mitsubishi that actually resulted in the interference with your contract. Yes, Your Honor. First, again, as we argued in our reply brief, we believe that the interference was twofold. First, the defendants interfered with the evaluation process, and they tainted the evaluation process. And then secondly, they interfered with ROTEC's prospective advantage by agreeing to pay the illegal 0.5 percent commission. With respect to the evaluation process, the evidence that ROTEC has presented, both direct and circumstantial evidence, we start with the defendant's agreement to hire Mr. Zhuang Ming Zhang, if I'm saying that right. In August of 1995, they offered Mr. Zhuang a quality control job. Mr. Zhuang was a committee member who was on the evaluation committee, and the testimony and declaration of Mr. Seeland, who was the president of C.S. Johnson at the time, one of the members and signatories to the contract with the defendants, testified that they hired or offered the quality control job to Mr. Zhuang in order to gain his favors for the bid evaluation process for Stage 2 and quiet his criticisms of C.S. Johnson during the Stage 2 bidding process. Next, we have the fact that defendants engaged in numerous communications with the committee members during the evaluation process. Now, when the buyer put out its bidding papers, there was an express prohibition to all the bidders from engaging in communications with the evaluation committee members during the evaluation. The defendants repeatedly violated this to their advantage. First, as Mr. Warnke said, bids were submitted to the buyer. On January 15th of 1996, there was a ceremony opening the bids, and again, bidders were warned against communicating with the evaluation committee. On January 25th of 1996, just five days after that, the defendants received a confirmation from their source that their bid was one of the best bid proposals. Now, how can they receive this confirmation unless it's coming from someone on the evaluation committee because no one else had access to it? Five days later, on January 25th of 1996, the defendants received a memo from Mr. Zhang Baoping on how to amend their bid proposal to please the evaluation committee after, quote, careful study and thorough analysis of the competitor's pricing, unquote. Mr. Baoping was also a committee member. On February 2nd, 1996, consortium member Potain sent a memo to Mitsubishi requesting that Mitsubishi provide it with a list of the committee members that Mitsubishi had already convinced to support their bid proposal. Now, at this time, we're in the initial evaluation process. During the process up until February 8th, the evaluation committee was reviewing all the bids to make sure that they were substantively correct and contained all of the information that was requested in the bidding papers. They hadn't even gone into any of the substance of the construction schemes or anything like that at this point. Yet Potain is asking Mitsubishi for a list of committee members that they had already convinced to support their bid proposal. February 8th, 1996, Mitsubishi sends a memo back to Potain in response and discusses the list of individuals that Potain had mentioned and advises Potain that they had forgot to mention Mr. Yuan Lin, who Mitsubishi said, quote, Mr. Yuan is for sure one of the most important members and definitely on our side, unquote. Again, this is February 8th. This is during the initial evaluation of the contracts. They've already had people that they've convinced on the committee to support their bid proposal prior to evaluating any of the substance of their bids. And on February 17th... Wait, as I understand it correctly, if I'm wrong, I need some help on this situation. As I understand it, the buyer somewhere along the line said what Mitsubishi did as far as the 5% and the employment situation had nothing to do with our selecting them. Is that in the record someplace or am I just dreaming that? Yes, Your Honor. The defendants did submit a letter from Mr. Heatbomb. That letter was written in response to an allegation from Rotec that if they allowed Mitsubishi to go forward, they would be violating Rotec's patents. Rotec's had patents on the system at the time. In response, Mr. Heatbomb wrote back and said, hey, you know, we're not doing this to harm you. They said we're not choosing Rotec because Rotec's expensive. They gave another reason. They said Rotec relies on multiple suppliers. They gave another reason. They said they wanted to use various suppliers for this contract and they needed different types of concrete placement for the project. Wasn't there some statement also about there being some complaints about Rotec's three units that they supplied? No, Your Honor. Those complaints were about the first unit that Rotec supplied in 1994 for Stage 1. But by the time they entered into the agreement, those problems had been corrected, and they had indeed sent memos back saying that Rotec's machine was operating successfully. The problem with the Hegon letter is that it contradicts the facts of the case, which are undisputed. First, Hegon says that Rotec's equipment are more expensive. That letter is undisputed too, isn't it? Excuse me? The letter is undisputed also, isn't it? Is there anything contrary by the buyer that says, No, we got the benefit of the deal here because that bribery situation was very instrumental in our deciding to go ahead with Mitsubishi. I'm a little bit concerned about the buyer's statement that the reason we did this had nothing to do with either the 5% or the employment situation. The buyer didn't say anything in that letter about the 0.5% commission or the evaluation committee members. They were responding to an allegation of potential patent infringement. Thank you. And what we said is it should be discounted and discredited because the reasons that he gave contradicted the actual facts, namely that Rotec's equipment was more expensive. It wasn't. Rotec was relying on multiple suppliers. Rotec wasn't. It's the fact that defendants were, and that they wanted different types of concrete placement when, in fact, the defendant's products were an exact duplicate of Rotec's products and were being used for the exact same type of concrete placement. So the reasons that were expressed in that letter, we think, should be discounted because they just contradict the facts. The last letter or memo was a February 17, 1996, memo from Mitsubishi Corporation to Mr. Mizutani, who was negotiating the contract, where Mitsubishi Corporation advised Mr. Mizutani that they had a private meeting with committee member, Mr. Bao Ping, where they went through and analyzed every other bidder's strengths and weaknesses with this committee member. We believe that the direct and circumstantial evidence in the documents clearly establishes that defendants had tainted the evaluation process. Remember, if they don't survive the evaluation process, they're out of the game. They're not negotiating.  The next wrongful conduct was the 0.5% commission. What do we know about the 0.5% commission? We know that defendants did not agree to pay the 0.5% commission until after Rotec had executed its contract for the three systems and in that contract had granted the buyer a binding option to purchase the two additional contracts. That was in November of 1996. Sometime between November 3rd of 1996 and December 16th, the defendants decided to agree to pay a 0.5% commission. Mr. Mizutani, the defendant's witness, testified that it was agreed that that commission would be paid prior to the execution of the contract. However, the price wasn't actually decided until the day of the contract. Was that suggested by the buyer? 5% is the situation suggested by the buyer? Yes, Your Honor. Mr. Mizutani's testimony indicated that the buyer required it and that the buyer demanded that there be some type of payment back to the buyer. We also know that the defendants thought that the 0.5% commission was important enough to put into writing. We also know that the defendants thought the 0.5% commission was important enough to incorporate it by reference as an integral part of the contract and therefore must have formed some consideration for that contract. We also know at the time that the buyer was holding the binding option contract with ROTEC, we know that ROTEC was not required to pay any commission. We also know that from the evidence that the other consortium members were not aware of the addendum agreement. After every member of the consortium carefully initialed every page of the contract, the only two parties that signed the addendum agreement for the 0.5% commission were Mr. Wujoon and Mr. Mizutani. The defendants have argued that this contract was open and disclosed when in fact the other consortium members, at least Tucker Associates, was unaware of this agreement until we filed our complaint. And one final point with respect to that 0.5% commission, it was going into a Hong Kong account of a sister company and if it was in fact a negotiated price discount, there was no way for the buyer to record that or account for it since it wasn't going back to their account. There is no other corroboration that this 0.5% commission was merely a negotiated price discount. The addendum agreement says nothing about it being a price discount. There's no testimony from any witnesses to support that it was a price discount and there's no other documentation to support that it was a price discount. And in fact, there's testimony from the defendant's witness. They initially tried to call it that it was a fee for services rendered, which happens to be the quote from the exception to the rule in the Robinson Patent 2C case. However, once learning that there was in fact no services rendered, that is when they changed their position. And I think if you take the rationale of CalGuard, there is ample evidence and reason to believe that the purpose claimed for the payment is not true and according to CalGuard, therefore, summary judgment would be inappropriate. Thank you, counsel. You have also used your time. We appreciate the arguments of both parties, albeit in reverse order. We appreciate the briefing and the case just argued is submitted.
judges: Skopil, Hall, Graber